IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                    NO.  CR 05-317 RB

RUSSELL PEPPERS,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's ("Mr. Peppers") motion to suppress the rifle and shotgun found in his vehicle and all statements elicited from him as a result of the stop and subsequent search of his truck on January 30, 2004.  The Government charged Mr. Peppers with Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  I conducted a motions hearing on January 7, 2005.  For the following reasons, I will **DENY** Mr. Peppers' motion to suppress with respect to the guns but will **GRANT** his motion with respect to the statements he made to police after his vehicle was stopped.

**I. Factual background.**

On December 12, 2003, in response to an uncorroborated citizen's tip, Chaves County Metro Narcotics Task Force officers began to investigate a possible methamphetamine laboratory being operated by Mr. Peppers in a shed near his residence on Buffalo Valley Road in Hagerman, New Mexico.  Farming is Hagerman's main industry and the area where Mr. Peppers' residence was located is rural and desolate.  Commander Jody Scifres and Sergeant Eric Brackeen visually surveyed all the sheds and barns in the vicinity of Mr. Peppers' residence and eventually located a shed about

one-quarter to one-half of a mile south of a ranch on the opposite side of Buffalo Valley Road. That shed was the only one surveyed with a lock on the door and a meter indicating it was wired for electricity.

Based on their narcotics investigation experience, the officers opined that the locked shed would make an ideal location for a methamphetamine lab due to its remoteness and the privacy it afforded. After locating the shed, Commander Scifres shared the information he had gathered with Hagerman Police Officer Bill Daleske. Commander Scifres instructed Officer Daleske to conduct surveillance on the property and advise him if he noticed Mr. Peppers near the shed.

About seven weeks later on January 30, 2004, Mr. Peppers and his wife, Leana Peppers ("Mrs. Peppers"), were residing on the ranch property located at Buffalo Valley Road in Hagerman. Mack Chase ("Mr. Chase"), who owned the property, provided housing to Mrs. Peppers as part of her employment with Mack Chase Energy Corporation. The Peppers lived on the ranch for approximately six months prior to January 30th, until Mr. Chase terminated Mrs. Peppers and gave notice to vacate the property. As of January 30th, however, they were still permitted to reside on the ranch as Mr. Chase had given an extension on their time to vacate the residence.

That same day, on January 30th, Commander Scifres received a call from Officer Daleske, who advised that he had seen two vehicles, one of which Officer Daleske knew belonged to a methamphetamine user, parked near the locked shed the previous night. Officer Daleske recognized the other vehicle as belonging to Mr. Peppers.

Commander Scifres relayed this information to Artesia Police Lieutenant Mike Baker and an FBI agent. They then contacted Mr. Chase who told the officers that neither Mr. Peppers or his wife had authority to use the shed and that the shed should not be locked. The officers received verbal

consent to search the shed and remove any locks located on the premises. The officers later discovered that they had in fact spoken with Mack Chase's son and that the Peppers did have authority to use the shed. However, the officers were not aware of this fact at that time.

On the night of January 30th, at about 9:15 p.m., a joint team of officers approached the shed in preparation for a search and observed people inside and two vehicles parked outside the shed. One of the vehicles left the shed heading south on Buffalo Valley Road and returned to the shed a short time later. Based on his narcotics investigation experience, Commander Scifres believed the activity around the shed to be consistent with the operation of a methamphetamine lab. In his experience, methamphetamine lab operators were often armed and willing to use violence to protect their assets. At approximately 10:45 p.m., two vehicles left the shed area at a high rate of speed, spinning their tires.

At this point, Commander Scifres called for backup and ordered his officers to stop the two vehicles that exited the shed area. Detective Mark Mahone and Sergeant Rodney Morris responded to Commander Scifres' call and attempted to stop the two vehicles, which were traveling one in front of the other. Detective Mahone testified that both drivers initially refused to yield to Sergeant Morris' lights and siren for about one-half mile and stopped only after arriving at the front door of the residence. Mr. Peppers drove a white pickup truck and his wife drove the other vehicle.

Sergeant Morris and Detective Mahone were in the same police car and drew their guns after stopping Mr. Peppers' vehicle. Detective Mahone testified that at the time of the stop, he knew Mr. Peppers was a convicted felon. Sergeant Morris ordered Mr. Peppers, the only occupant of the vehicle closest to his squad car, out of the truck and directed him to lie face first on the ground. Other officers arrived at the scene shortly thereafter. Detective Mahone told Mr. Peppers that he was

not under arrest but placed handcuffs on him. Detective Mahone conceded that Mr. Peppers was detained at this point, and would not be free to leave. Detective Mahone then looked inside Mr. Peppers' truck and saw a .22 caliber rifle and a gun case in the front cabin.

After two to three minutes, Detective Mahone began interrogating Mr. Peppers about the ownership of the guns, without *Mirandizing* him. Mr. Peppers indicated that he owned the guns. He also told Detective Mahone that he used the rifle to shoot varmints at the ranch and that the gun case contained a 12-gauge shot gun. Detective Mahone obtained Mr. Peppers' consent to remove the guns from his vehicle. Both guns were loaded.

After the vehicles were stopped, Commander Scifres and the other officers secured and searched the shed. They found some tools and a broken down truck, but did not discover a methamphetamine lab. The officers also searched the Peppers' residence that night, with Mrs. Peppers' consent, and did not find any evidence of a crime. The officers never obtained a search warrant to search either the shed or the vehicles. No arrests were made that night.

Officers eventually obtained a warrant and arrested Mr. Peppers on February 10, 2004. The Government charged Mr. Peppers with Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

**II. Analysis.**

First, Mr. Peppers argues that the initial stop of his vehicle was not justified under *Terry v. Ohio*, 392 U.S. 1 (1968). In order to lawfully stop a vehicle the police must reasonably suspect, based on "specific and articulable facts [and] rational inferences from those facts" under the totality of the circumstances, that a person is engaged in or about to engage in unlawful activity. *Id.* at 21; *see also United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (holding that officers may "draw on

their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'") (internal citations omitted).

In this case, the police received a tip that Mr. Peppers operated a methamphetamine lab near his residence on Buffalo Valley Road. After surveying the area, officers located a shed near the residence that was the only shed in the area locked and wired for electricity. Based on the officers' knowledge and experience, they viewed this shed as an ideal location for operating a methamphetamine laboratory. The purported owner of the property informed the officers that Mr. Peppers had no authority over this shed and that the shed should not be locked.

On January 29, 2004, Officer Daleske observed the vehicles of Mr. Peppers and a known methamphetamine user parked near the shed at night. The next day, officers again observed Mr. Peppers' vehicle and another truck parked near the shed as they prepared to search the shed, apparently with Mr. Chase's consent. After one vehicle left the shed area and returned a short time later, both vehicles left the area at a high rate of speed, spinning their tires. Detective Mahone's car attempted to stop the two vehicles pursuant to Commander Scifres' directive. Both drivers initially ignored the sirens and lights and stopped about a half mile later in front of the Peppers' residence. Under the totality of the circumstances, the police had reasonable suspicion that Mr. Peppers was engaged in criminal activity. The initial stop of his truck, therefore, was reasonable.

Second, Mr. Peppers contends that no exception to the warrant requirement existed that allowed officers to search his pickup truck. A warrantless search of a vehicle is permissible if there is probable cause to believe that the vehicle contains evidence of a crime. *California v. Carney*, 471 U.S. 386, 392 (1985). In other words, a warrantless vehicle search is allowed if "under the *'totality*

*of the circumstances'* there is a 'fair probability' that the car contains contraband or evidence [of a crime]." *States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993) (emphasis in original) (internal citations omitted).

In this case, officers observed Mr. Peppers near a shed they suspected housed a methamphetamine laboratory the night before they stopped his vehicle. The officers knew that Mr. Peppers had prior felonies when they stopped his truck, pursuant to Commander Scifres' directive, after it left the shed area. These facts present a "fair probability" that contraband or other evidence of a crime would be found in Mr. Peppers' truck. *Id.* Moreover, Detective Mahone stated that he saw the firearms at issue in plain view in the passenger compartment following the stop of Mr. Peppers' vehicle. Plain view constitutes another exception to the warrant requirement.

Furthermore, Detective Mahone acted reasonably in searching Mr. Peppers' truck for weapons following the initial stop. In *United States v. Merritt*, the Tenth Circuit held that "where the police believe that a particular suspect may be armed and dangerous, they should be permitted to 'frisk' his vehicle as well as the individual 'to discover guns, knives, clubs or other hidden instruments for the assault of the police officer.'" 695 F.2d 1263, 1271 (10th Cir. 1982). Detective Mahone, therefore, acted reasonably in looking into Mr. Peppers' vehicle after he detained him. Moreover, when "the police confront an individual reasonably believed to present a serious and imminent danger to the safety of the police and public, they are justified in taking reasonable steps to reduce the risk that anyone will get hurt." *Id.* at 1274.

In this case, the police did not violate Mr. Peppers' Fourth Amendment rights when they drew their guns, ordered him on the ground, and handcuffed him following the initial stop of his vehicle. At that time, they reasonably suspected Mr. Peppers of operating a methamphetamine lab in a shed

near his residence. Mr. Peppers refused to yield to the officers when they tried to stop his vehicle as it left the shed area. Mr. Peppers eventually stopped in front of his residence, in the dark of night. Based on his training and experience with the operators of methamphetamine labs, Detective Mahone acted reasonably in looking into Mr. Peppers' vehicle to "reduce the risk that anyone [would] get hurt." *Id.* The guns discovered in Mr. Peppers' truck, therefore, will be admitted. The Court in *Merritt*, however, based its ruling solely on Fourth Amendment grounds and did not address whether statements made by the defendant should be suppressed on independent Fifth Amendment grounds.

Third, Mr. Peppers claims that Detective Mahone interrogated him in violation of the Fifth Amendment. The Fifth Amendment requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). A person is in custody for purposes of *Miranda* where there was a "'restraint on freedom of movement' of the degree associated with a formal arrest" under the totality of the circumstances. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal citations omitted). The relevant inquiry, then, is "how a reasonable man in the suspect's position would have understood his situation." *Perdue*, 8 F.3d at 1464 (internal citations omitted).

In this case, Sergeant Morris and Detective Mahone stopped Mr. Peppers' truck in front of his residence, at night. Sergeant Morris ordered Mr. Peppers out of his vehicle and directed him to lie down on the ground. Detective Mahone then handcuffed him. Although Detective Mahone told Mr. Peppers that he was not under arrest, a reasonable person would not feel free to leave under these circumstances. Mr. Peppers, therefore, was in custody for purposes of *Miranda*.

The second *Miranda* requirement is that the police must subject the suspect to interrogation.

*Perdue*, 8 F.3d at 1264. Interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* (internal citations omitted). Detective Mahone knew Mr. Peppers was a felon so an inquiry into who owned the guns was likely to elicit an incriminating response from him since felons are prohibited from possessing firearms. Detective Mahone, therefore, interrogated Mr. Peppers for purposes of *Miranda*. Detective Mahone never read Mr. Peppers his *Miranda* rights before questioning him about the guns found in the vehicle. Because Mr. Peppers was in custody at this point, any statements he made regarding his ownership and use of the guns must be suppressed.

Lastly, Mr. Peppers argues that the officers did not receive valid consent to search the shed or the truck he drove. Mr. Chase could consent to the search of his property and the officers had reasonable suspicion to stop and search Mr. Peppers' truck for evidence of a crime. This argument, therefore, is without merit.

**III. Conclusion.**

Because the officers had reasonable suspicion to stop Mr. Peppers' vehicle and found the guns at issue in plain view, the Court will **DENY** Mr. Peppers' motion to suppress with respect to the guns. However, because Mr. Peppers was interrogated in violation of his Fifth Amendment rights, the Court will **GRANT** his motion to suppress with respect to any statements he made to police following the initial stop of his vehicle.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**